# NO. 13-4477

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

**DONNA POLYNICE,**

**Plaintiff-Appellant,**

**v.**

**CAROLYN COLVIN,**
**Commissioner of Social Security,**

**Defendant-Appellee.**

---

---

## APPELLANT'S BRIEF

---

Mark Schneider
Attorney for Appellant
57 Court Street
Plattsburgh, NY  12901
(518) 566-6666

# TABLE OF CONTENTS

page

Table of Authorities..................................................................................... i.

Preliminary Statement.................................................................................. v.

Jurisdictional Statement............................................................................... v.

Issues Presented........................................................................................... 1

Procedural History....................................................................................... 1

Facts............................................................................................................. 2

Standard of Review...................................................................................... 23

Argument...................................................................................................... 24

    I.     The Commissioner did not meet his burden at Step 5 that Ms. Polynice could perform work.................................................... 24

    II.    The ALJ erred in discrediting the Appellant's testimony without clear and convincing evidence.......................................... 26

    III.   Ms. Polynice was disabled under Listings 1.02 and 1.03 because of her inability to ambulate effectively....................................... 31

    IV.   The ALJ violated the treating physician rule................................. 34

    V.    Ms. Polynice was disabled by her combination of exertional and non-exertional limitations of pain, morbid obesity, and mental illness........... 38

    VI.   The ALJ erred in not presenting the vocational expert with an accurate hypothetical question........................................ 47

    VII.  The Magistrate Judge erred by not requiring the Commissioner to file the records from Ms. Polynice's subsequent approved claim........................ 52

Conclusion.................................................................................................... 55

Certification Pursuant to FRAP 32(a)(7)(b)(i.)........................................... 55

# TABLE OF AUTHORITIES

**Cases:**                                                 page

Aubeuf v. Schweiker, 649 F.2d 107 (2d Cir. 1981) ................................. 48

Balsamo v. Chater, 142 F.2d 75 (2d Cir. 1998) ..................................... 29

Batista v. Chater, 972 F.Supp. 211 (S.D.N.Y. 1997)............................... 28

Berry v. Schweiker, 675 F.2d 464 (2d Cir. 1982)..................................... 25,26

Bonifacio v. Comm 'r of Soc. Sec., 2012 U.S. Dist. LEXIS 109011
    (N.D.N.Y. 2012).................................................................................. 48

Brown v. Apfel, 991 F.Supp. 166 (W.D.N.Y. 1998)................................. 35

Brown v. Barnhardt, 418 F.Supp.2d 252 (W.D.N.Y. 2005) .................... 47

Bruton v. Massanari, 268 F.3d 824 (9th Cir. 2001)................................. 52

Burgo v. Harris, 1981 U.S. Dist. LEXIS 16406 (E.D.N.Y. 1981)............. 41

Caballero v. Barnhardt, 2003 U.S.Dist.LEXIS 19485 (E.D.Pa. 2003)...... 46

## Cases:

Carroll v. Sec. of HHS, 705 F.2d 638 (2nd Cir. 1983) .............................................. 41

Ceballos v. Bowen, 649 F.Supp. 693 (S.D.N.Y. 1986)................................................ 27

Chamblin v. Astrue, 2010 U.S.Dist.LEXIS 108638 (D.Colo. 2010) ........................ 52

Chavis v. Astrue, 2012 U.S. Dist. LEXIS 176016 (N.D.N.Y. 2012)
    adopted by, 2012 U.S. Dist. LEXIS 175119 (N.D.N.Y. 2012)........................ 45

Cornell v. Astrue, 764 F. Supp. 2d 381 (N.D.N.Y.  2010)........................................... 45

Dailey v. Barnhardt, 277 F.Supp.2d 226 (W.D.N.Y.2003) ........................................ 29

Derienzas v. Heckler, 748 F.2d 352 (2d Cir. 1984)..................................................... 41

Desmond v. Astrue, 660 F.Supp.2d 329 (D.Conn. 2009),
    adopted 2009 U.S.Dist.LEXIS 84547............................................................... 53

Deutsch v. Harris, 511 F.Supp. 244 (S.D.N.Y. 1981)................................................. 41

Diaz v. Astrue, 2012 U.S.Dist.LEXIS 125708 (D.Conn. 2012) ................................ 48

Dilligard v. Bowen, 1989 U.S.Dist.LEXIS 3520 (S.D.N.Y. 1989) .......................... 38

Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995) .......................................................... 38

F.S. v. Astrue, 2012 U.S. Dist. LEXIS 18865  (N.D. N.Y.2012)............................... 28

Felicie v. Chater, 1996 U.S.Dist.LEXIS 22004 (S.D.N.Y. 1996)............................. 48

Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1987)................................................... 23,28

Fox v. Astrue, 2008 U.S.Dist.LEXIS 24459 (N.D.N.Y. 2008) ................................. 31

Fragale v. Chater, 916 F.Supp. 249 (W.D.N.Y.1996)................................................ 28

Garcia v. Astrue, 2012 U.S. Dist. LEXIS 98369 (N.D.N.Y. 2012),
    adopted by, 2012 U.S. Dist. LEXIS 98372 (N.D.N.Y. 2012)........................ 45

Genier v. Astrue, 298 Fed.Appx. 105 (2d Cir. 2008)................................................. 41

Genier v. Astrue, 606 F.3d 46 (2d Cir. 2010) ............................................................ 41

Ghazibayat v. Schweiker, 554 F.Supp. 1005 (S.D.N.Y. 1983) ................................. 41

Gibbons v. Bowen, 653 F.Supp. 1478 (S.D.N.Y. 1987)............................................. 41

Goldthrite v. Astrue, 535 F.Supp.2d 329 (W.D.N.Y.2008) ....................................... 27

Gonzalez v. Callahan, 1997 U.S.Dist.LEXIS 5208 (S.D.N.Y.1997)........................ 45

Gray v. Astrue, 2009 U.S.Dist.LEXIS 23610 (N.D.N.Y. 2009) ............................... 33

Groat v. Barnhardt, 282 F.Supp.2d 965 (S.D.Iowa 2003)......................................... 36

Guadalupe v. Barnhart, No. 04-CV-7644, 2005 U.S. Dist.
    LEXIS 17677 (S.D.N.Y. Aug. 24, 2005)........................................................ 45

Hayes v. Astrue, 488 F.Supp.2d 560, 565 (W.D. Va. 2007) ..................................... 52

Hilton v. Apfel, 1998 WL 241616 (S.D.N.Y. 1998).................................................. 36

Hogan v. Astrue, 491 F. Supp. 2d 347 (W.D.N.Y. 2007)........................................... 45

Hulbert v. Comm'r of Soc. Sec., 2009 U.S. Dist. LEXIS 77508 (N.D.N.Y. 2009),
    adopted by, 2009 U.S. Dist. LEXIS 78103 (N.D.N.Y. 2009) ........................ 45

Hunt v. Astrue, 2009 U.S. Dist. LEXIS 117620 (N.D.N.Y. 2009),
    adopted by, 2009 U.S. Dist. LEXIS 117440 (N.D.N.Y. 2009)........................ 45

**Cases:**                                                                page

Ianiro v. Schweiker, 1983 U.S.Dist.LEXIS 18095 (E.D.N.Y. 1983).......................... 41

Jacob v. Shalala, 872 F.Supp. 1166 (E.D.N.Y. 1994) ................................................. 38

Johnson v. Bowen, 817 F.2d 983 (2d Cir. 1987). ....................................................... 23

Jones v. Colvin, 2013 U.S. Dist. LEXIS 47271 (N.D.N.Y. 2013),
    adopted by, 2013 U.S. Dist. LEXIS 45380 (N.D.N.Y, Mar. 29, 2013)........... 45

Keppler v. Heckler, 587 F.Supp. 1319 (S.D.N.Y. 1984)............................................ 42

Lackner v. Astrue, 2011 U.S. Dist. LEXIS 65200 (N.D.N.Y.  2011),
    adopted by, 2011 U.S. Dist. LEXIS 64938 (N.D.N.Y. 2011) ........................ 45

LeFaucher v. Colvin, 2013 U.S.Dist.LEXIS 45375
    (N.D.N.Y. 2013) ........................................................................... 44

Leonard v. Comm'r of Soc. Sec., 2008 U.S. Dist. LEXIS 60900
    (N.D.N.Y. Aug. 7, 2008)............................................................... 47

Lester v. Chater, 81 F.3d 821 (9th Cir. 1995) ................................................ 39

Lewis v. Apfel, 236 F.3d 503 (9th Cir. 2001) ............................................ 33

Little v. Heckler, 787 F.2d 591 (6th Cir. 1986)............................................ 32

Lunan v. Apfel, 1999 U.S.Dist.LEXIS 21363 (N.D.N.Y.1999),
    aff'd, 2000 U.S.Dist.LEXIS 3024 (N.D.N.Y.2000)................................... 28

Mangual v. Pleas, 2005 U.S.Dist.LEXIS 19785 (S.D.N.Y. 2005)............................. 36

Martin v. Astrue,  2008 U.S. Dist. LEXIS 73767
    (N.D.N.Y. Sept. 9, 2008)............................................................... 45

Martin v. Colvin, 2013 U.S. Dist. LEXIS 69214 (N.D.N.Y. 2013)........................... 45

Maya v. Apfel, 1999 U.S.Dist.LEXIS 6248 (E.D.N.Y. 1999) ................................. 36

Mazzella v. Secretary of United States Dep't of Health and Human Services,
    588 F.Supp. 603 (S.D.N.Y. 1984)...................................................... 40

McKeavitt v. Astrue, 2012 U.S. Dist. LEXIS 138320 (N.D.N.Y. 2012)................... 45

McLaughlin v. Secretary of Health, Educ. & Welfare, 612 F.2d 701
    (2d Cir. 1980)............................................................................ 26

Melchior v. Apfel, 15 F.Supp.2d 215 (N.D.N.Y. 1998)............................................ 27

Minuto v. Sec. of HHS, 525 F.Supp. 262 (S.D.N.Y. 1981)...................................... 42

O'Grady v. Heckler, 588 F.Supp. 850 (E.D.N.Y. 1984)............................................ 42

Osborn v. Astrue, 2010 U.S.Dist.LEXIS 115139 (W.D.Wash. 2010),
    adopted by, 2010 U.S.Dist.LEXIS 115270 (W.D.Wash. 2010)...................... 33

Owens v. Astrue, 2010 U.S.Dist.LEXIS 101481 (W.D.Va. 2010) ........................... 53

Parker v. Harris, 626 F.2d 225 (2d Cir.1980)................................................. 24

Petit v. Astrue, 2012 U.S.Dist.LEXIS 129425 (C.D.Cal. 2012)................................ 33

Reed v. Secretary of HHS, 804 F.Supp. 914 (E.D.Mich. 1992)................................ 28

Richardson v. Perales, 402 U.S. 389, 401 (1971)........................................... 23

**Cases:**                                                                                                    **page**

Rienhardt v. Astrue, 2009 U.S. Dist. LEXIS 126238 (N.D.N.Y. 2009),
    adopted by, 2010 U.S. Dist. LEXIS 28754 (N.D.N.Y. 2010)............................. 45

Rivera v. Heckler, 618 F.Supp. 1173 (E.D.N.Y. 1985)................................................. 42

Rockwood v. Astrue, 614 F. Supp. 2d 252 (N.D.N.Y. 2009),
    adopted by, 2009 U.S. Dist. LEXIS 36528 (N.D.N.Y. 2009) ........................... 45

Rosa v. Callahan, 168 F.3d 72 (2d Cir. 1999)................................................................ 42

Scalzo v. Heckler, 652 F.Supp. 530, 538 (D.R.I. 1987) ............................................... 37

Schaal v. Apfel, 134 F.3d 496 (2d Cir. 1998)................................................................. 25

Sellie v. Astrue, 2009 U.S. Dist. LEXIS 80646 (N.D.N.Y. 2009)............................... 45

Shane v. Chater, 1997 WL 426203 (N.D.N.Y.1997)..................................................... 27

Shaver v. Comm'r of Soc. Sec., 2008 U.S. Dist. LEXIS 51570 (N.D.N.Y. 2008)...... 45

Shutts v. Colvin, 2013 U.S.Dist.LEXIS 113930  (N.D.N.Y. 2013)............................. 44

Skarbek v. Barnhart, 390 F.3d 500, 504, 105 Fed. Appx. 836 (7th Cir.2004)............ 45

Snell v. Apfel, 177 F.3d 128 (2d Cir. 1999).............................................................23,26

State of N.Y. v. Bowen, 655 F.S. 136 (S.D.N.Y. 1987), aff'd, 906 F.2d 910
    (2nd Cir. 1990)........................................................................................................ 25

Stevens v. Barnhart, 473 F.Supp.2d 357 (N.D.N.Y. 2007)........................................... 18

Tempesta v. Astrue, 2009 U.S.Dist.LEXIS 6019 (E.D.N.Y.2009) ............................. 53

Terry v. Astrue, 2010 U.S.Dist.LEXIS 131164, * 9 (W.D.Va. 2010) ......................... 46

Toro v. Chater, 937 F.Supp. 1083 (S.D.N.Y. 1996).................................................... 27

Torres v. Bowen, 700 F.Supp. 1306 (S.D.N.Y. 1988)................................................. 27

Vargas v. Sullivan, 898 F.2d 293 (2d Cir. 1990) ......................................................... 24

White v. Barnhardt, 336 F.Supp. 2d 1183 (N.D.Ala. 2004)........................................ 36

Williams v. Bowen, 859 F.2d 255 (2d Cir. 1988)................................................. 23,27,29


**Statutes, Regulations, and Rulings:**                                                                 **page**

42 U.S.C. § 423(d)(5)(A)............................................................................................ 26

20 C.F.R. § 404.929..................................................................................................... 26

20 CFR § 404.1505...................................................................................................... 25

20 C.F.R. § 404.1512(a) .............................................................................................. 39

20 C.F.R. §§ 404.1520, 416.920................................................................................. 25

20 C.F.R. §§ 404.1527 .......................................................................................34,25,36

20 C.F.R. § 404.1529................................................................................................... 29

20 C.F.R. §404.1545.................................................................................................... 29

20 CFR § 404.1567...................................................................................................... 26

20 C.F.R. §§ 416.929(a) & (c)..................................................................................... 32

20 CFR Subpart P., App. 1, §1.00(B)(2)(b) ............................................................... 32

20 C.F.R. Subpt. P, App. 1, § 1.00(q)......................................................................... 43

**Statutes, Regulations, and Rulings:**                                                    **page**

20 CFR Subpart P., App. 1, §§ 1.02 and 1.03...........................................................31-32
20 CFR Subpart P., App. 1, § 12.04.................................................................... 47
20 C.F.R. Subpt.  P, App. 2 § 200.00(c)............................................................. 38
Social Security Ruling SSR No. 02-01p, 2002 SSR LEXIS 1.................................. 43
SSR 95-5p, 1995 WL 670415(SSR)..................................................................... 29
SSR 96-9R ......................................................................................................... 39

**Other Sources:**                                                                         **page**

165 <u>ALR Fed</u> 203, "Standard and Sufficiency of Evidence When Evaluating
    Severity of Pain in Social Security Disability Case Under § 3(a)(1) of
    Social Security Benefits Reform Act of 1984, 42 U.S.C.A. § 423(d)(5)(A)"........ 27
*Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition,
    Text Revision. Washington, DC, American Psychiatric Association, 2000........... 18
The Dictionary of Occupational Titles ("DOT")........................................................ 49
Dorland's Illustrated Medical Dictionary ("DIMD"), 28th Ed. (1994) ..................... 46
Health Information Center, Cleveland Clinic, Dr. Gordon Bell,
    <u>http://www.spineuniverse.com/displayarticle.php/article3072.html</u>..................... 37
Understanding-Blood-Pressure-Readings_UCM_301764_Article.jsp
<u>http://radiopaedia.org/articles/chondromalacia_grading</u>............................................ 15
http://www.healthgrades.com/physician/dr-david-hinsman-342p6/
    background-check............................................................................................... 18
<u>http://www.heart.org/HEARTORG/</u>Conditions/HighBloodPressure/
    AboutHighBloodPressure/................................................................................... 10
<u>http://medical-dictionary.thefreedictionary.com/antalgic+gait</u>................................ 13
<u>http://www.healthgrades.com/physician/dr-thomas-kneifel-2wtdp</u>
    background-check............................................................................................... 10

## PRELIMINARY STATEMENT

This Appeal is from the final decision of District Judge David N. Hurd of the Northern District of New York denying Social Security and SSI disability benefits to Appellant Donna Polynice.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this action pursuant to 42 U.S.C. § 405(g). This Court has jurisdiction over this Appeal pursuant to 28 U.S.C. § 1291 and FRAP 4.

v.

## ISSUES PRESENTED

I.      Did the ALJ err in not crediting Ms. Polynice's testimony?

II.     Was Mr.Polyice disabled pursuant to the Listings at §1.02 and 1.03?

III.    Did the ALJ violate the treating source rule?

IV.     Did Ms. Polynice have the residual functional capacity to work with her combination of her orthopedic impairments, pain, mental impairments, and morbid obesity?

V.      Did the ALJ provide the vocational expert with an incorrect hypothetical and was the VE's opinion supported by the Dictionary of Occupational Titles?

VI.     Did the Magistrate Judge err by not requiring the Commissioner to submit the record from his approval of Ms. Polynice's subsequent claim?

## PROCEDURAL HISTORY

On June 26, 2008, Donna Polynice filed her application for Social Security and Supplemental Security Income (SSI) disability benefits. She alleged disability beginning February 1, 2006. She appeared and testified at a hearing held on May 20, 2010 with ALJ Farrell. On June 16, 2010, ALJ Farrell denied her Appeal (Record "R": 90). [1] She filed a timely Request for Review with the Appeals Council. On July 26, 2012, the Appeals Council denied her Appeal (R: 1).

On September 9, 2012, she filed her Appeal with the District Court. On September 23, 2013, Social Security approved Ms. Polynice's subsequent claim.

---

[1] Appellant refers to the Joint Appendix as the "Record" because it is the complete administrative record filed with the District Court by the Commissioner.

On October 1, 2013, Ms. Polynice submitted that approval to the Magistrate Judge for consideration. On October 18, 2013, the Magistrate Judge issued his Report and Recommendation denying the Appeal. Ms. Polynice filed a timely Objection with the District Judge. On November 19, 2013, the District Judge accepted the Report and Recommendation and entered Judgment for the Commissioner.  Ms. Polynice filed her Notice of Appeal on November 19, 2013.

## FACTS

### A. Hearing, May 20, 2010:

*Donna Polynice testified as follows:* She is 47 years old. She is 5' 4" tall (R: 109) and weighs 245 pounds. She is right-handed. She has a driver's license, owns a car, and drove five minutes to court today. She gets income from DSS. She has had no other income since applying (R: 110).

She lives alone in an apartment. She received her GED and is going to college, but didn't "maintain" the past two semesters. She started Clinton Community College in spring 2008. She had surgery, so she missed classes (R: 111). She completed *one* course and her instructor is working with her on her English due to her health. She completed three courses over three semesters – nine credits (R: 112). For financial reasons, she will not be able to attend this fall (R: 113).

She had childcare training at CV Tech (Champlain Valley Technical Institute). She worked in this field until 2008 (R: 114). She worked 12 to 15 hours a week doing this for a year and a half, almost two years. She stopped in the spring of 2008 (R: 115). She was starting college at that time (R: 116). She fell at her house in March. She was as a certified nurse's assistant (CNA) (from 2003 to 2006 where she did laundry and pushing (R: 116). She was at the County Nursing Home from 1996 to 2003. It is not feasible for her to work. She has a VESID (Vocational and Educational Services for Individuals with Disabilities) worker who is seeing what's available and what she can do (R: 117).

Ms. Polynice struggles ever day just staying at home - trying to take care of her own house. She can't do CNA work anymore - she can't lift, bend, or kneel. She can't stand or walk for a long period of time. She has osteoporosis in her knees. She just went through surgery. After therapy and losing weight, the pain has gotten worse. The pain is horrific. She has a leg brace that she uses as much as possible – it irritates her skin. It helps her walk, but she still can't walk a long distance (R: 118).

Both knees hurt, mostly the left one. She has constant pain every day. It gets worse with walking. The front part of her knee on the right side is just sore if she doesn't walk.  If she walks, it feels like knives going through it and it pops. She has a prescribed cane to walk. She uses it mostly when it is damp or raining (R:

119). She doesn't use it around her house. She got it from medical supply store (R: 120).

Last summer, she had horrific pain. It has improved since. She could barely walk (R: 120). That's why they did the surgery on her left knee. The deterioration was getting worse (R: 121). Surgery was not too helpful. The pain has improved and now she can walk. She still has daily pain though. She won't take Celebrex because of her kidney problem. She takes Tylenol and uses Voltaren Gel on her knees (R: 122). The doctor will not do surgery on the right knee until left one is better. Walking brings on pain in her right knee. She also has osteoarthritis in her low back. She doesn't know how much she can lift. She sees Dr. Kneifel and does physical therapy if insurance allows it (R: 123).

She now takes: Lisinopril, Sertaline, and Ropinirole. Sertaline is for depression/anxiety. It is prescribed by Dr. Frostic (R: 124). Ropinirole is for restless leg syndrome. She takes Tylenol three times a day (R: 125). Tylenol helps somewhat. She can sit for two to three hours, but has to keep moving because of her low back pain. She has to shift in her chair. She can stand 15 to 20 minutes to do the dishes. She can walk five to ten minutes (R: 126).

She has a hard time getting out of the tub. She fixes her own meals and does housekeeping. It is hard for her to bend and pick things up. She drives most every day (R: 127). She does her own shopping. She goes to church every Sunday (R:

128). She has planted a few seeds at the community garden. The 4-H club helps with this. She does nothing for entertainment (R: 129).

She normally gets out of bed at 6 a.m. Then she goes back to bed until 10:30 a.m. (R: 129). She goes to bed at night at around 11 p.m. She does housekeeping whenever she can. She shops the first week of the month. She does not use alcohol or illegal drugs. She lies down during day sometimes. It helps with the pain. She uses ice for swelling, two to three times a day (R: 130).

During the hearing, she is sitting with left arm behind her back. This feels like something is pinching there. She is rocking back and forth trying to get comfortable. She is not comfortable (after a half-hour at the hearing).  Her lower back feels like it is pinching. She can't focus because of the pain (R: 131).

She is getting treated for depression and anxiety (R: 131). She is scheduled to see a psychiatrist at CVPH (Champlain Valley Physicians Hospital) Clinic in July. She gets anxious and nervous. She feels there isn't enough time to do everything. Her heart beats fast and she gets nauseous (R: 132). It depends on her stress level. When she is depressed, she cries easily and is hard with her children. She doesn't feel like being around. She used to want to harm herself (R: 133).

She used to weigh 290 pounds. Now she weighs about 240. She also has pain in her left ankle (R: 134). It aches really badly. It feels like she is going to fall when she walks (R: 135).

She needs to take special classes in English to complete her assignments she didn't do when she had surgery. She has a "C" grade last she knew (R: 135). She is limited in writing due to carpal tunnel syndrome. She is limited in lifting or using her right hand because it goes numb (after two to three hours of using it)(R: 136).

She has a history of chronic bronchitis (R: 136). She is using a CPAP machine for sleep apnea. It helps her sleep at night. Her hypertension is under control with medicine. She has problems bending and putting on her shoes and socks (R: 137). With gardening, she sits on the ground and the 4-H people help her put in the seed.

She was injured on the job as a CNA. She sees "Maura" at Clinton County Mental Health (CCMH) for therapy. Dr. Frostic prescribes her medicine. She goes twice a month to CCMH. She has a hard time reading and understanding the newspaper (R: 138). She has problems climbing stairs. She lives in a ground floor apartment. She has a brace to relieve the numbness in her hands (R: 139). She can't write or use her hand with a brace on it. She then leaves it on for a couple of hours to relieve the pain (R: 140).

*Vocational Expert David Festa testifies* (R: 140). The ALJ gives a hypothetical question to Mr. Festa: A person ages 43 to 47, with the same past work and education as Claimant. Limited to simple work, could occasionally lift, carry, push, and pull 20 pounds. Could stand and walk two hours in a workday

with normal breaks. Standing limited to 10 or 15 minutes at a time. Afterwards, the person would need to sit a few minutes before resuming standing. The person could walk for five minutes a few times a day. The person could sit six hours in a normal workday, limited to two hours at a time (R: 143) after which they would need to stand or walk a few minutes before resuming sitting. They should avoid exposure to respiratory irritants (R: 144). In response to the hypothetical question, the Vocational Expert testifies that these limitations would rule out past work. This person could do simple sedentary occupations. 1) Charge account clerk: 205.367-014. SVP 2, unskilled. Sedentary; 2) Addresser: 209.587-010. SVP 2, Sedentary (R: 144); and 3) Order clerk, food and beverage clerk: 209.567-014. SVP 2, unskilled. Sedentary. A person who periodically uses a cane could do these sedentary jobs. Hypothetical Question No. 2 by the ALJ: Same assumptions, but can frequently, but not continuously, handle and finger. The Expert testifies that they could still do these jobs (R: 145).

First hypothetical question by Claimant's attorney: Using the ALJ's last hypothetical, assume that the person also has to sit with left hand behind their back. The Expert states that if this is constant, the person cannot do any jobs. Attorney's Hypothetical No. 2: If they had to sit with left hand behind back occasionally? The Expert opined that they still could not do the three jobs because they require both hands. Attorney's Hypothetical No. 3: What if the person had

problems with memory and focus and concentration because of pain, anxiety, and depression (R: 146)? The expert opined that if severe, the person could not work. If moderate, this does not preclude these jobs because they are unskilled. Attorney's Hypothetical No. 4: What if the person could only sit for one hour at a time before changing position for 10 minutes every hour (R: 147)?  The Expert opined that a person cannot be off task this much and do any of these jobs (R: 148).  What if she has difficulty comprehending writing on a 7th grade level? She could still do these unskilled jobs. Last Hypothetical by Attorney: A person with random panic attacks who would have to be off job for fifteen minutes to an hour unpredictably (R: 149)? The Expert opines that this person could not work if off job this much (R: 150).  If the person could not lift 10 pounds, they can still do these three sedentary jobs (R: 151).

## B. Medical records

On March 9, 2008, the x-ray of Ms. Polynice's left knee indicated mild to moderate medial joint space narrowing compatible with osteoarthritis (R: 401). The x-ray of her right knee indicated mild arthritis (R: 402). On March 20, 2008, Dr. Frostic from the Champlain Valley Physicians Hospital Clinic (CVPH) noted her recent episodes of bronchitis and low EVR (expiatory lung volume) due to excessive weight (R: 537). She needs to use a CPAP machine (for sleep apnea). It makes a big difference the next day. Bilateral knee pain (R: 538).

On June 12, 2008, Dr. Frostic noted her chronic low back pain. Increase in knee pain and back pain doing both jobs. Still doing daycare in the afternoon, now working at Price Chopper for six hours in evening (R: 504). On June 19, 2008, Dr. Frostic noted on the fourth day at Price Chopper, she developed severe pain in her right foot. Seen in the E.R. and diagnosed with tendonitis, placed in a post-op shoe, and given Percocet. Still unable to stand for any length of time without developing pain (R: 502). The June 15, 2008 x-ray of her left foot indicated mild osteoarthritis of first MTP (metatarsophalangeal) joint (R: 405). The June 24, 2008 x-ray indicated moderate degree of medial joint space narrowing in both knees (R: 404). On June 24, 2008, Dr. Frostic noted her painful right foot. She was seen in the E.R. She has been off work this week, but really not much better. It is very difficult for her to get out of bed in the morning and start walking. She will continue to be out of work next week (R: 499). Dr. Frostic stated: "Her weight contributes greatly to symptoms of the lower extremities. [She] would like to look into getting gastric bypass surgery done" (R: 500).

On June 30, 2008, Dr. Frostic noted that she was out of work for three weeks. She was seen in the E.R. and in the office. Increased pain in right foot and both knees. She is going to try to continue day care job. She cannot do her new job at Price Chopper. Hypertension, obesity, sleep apnea, chronic low back pain, depression, osteopenia, chronic knee pain bilaterally, and patellofemoral pain

syndrome (R: 285). Right knee exam- good ROM (range of motion), some tenderness over medial joint space (R: 285).

The July 1, 2008 MRI of her right knee indicated degenerative changes, at all three compartments of the knee, most pronounced at medial compartment where there are moderate osteophytes, subchondral reactive marrow changes, and apparent thinning, if not partial denuding of femoral condyle cartilage, 2) the body of the medial meniscus is displaced medially and contains globular signal. The posterior horn of the medial meniscus is rather diminutive and there may be an inferiorly surfacing tear, and 3) there likely is an inferiorly surfacing tear in the posterior horn of the lateral meniscus (R: 406-407).

On July 9, 2008, Dr. Frostic noted her swollen right foot and ankle. She broke this ankle in the past, but the swelling is new. He noted some discomfort (R: 494). On July 22, 2008, Dr. Frostic noted swelling in both legs. BP: 146/94. [2] Weight 272. Start on Lasix (R: 282). On August 8, 2008, Dr. Kneifel [3] stated that she had worse pain in her right knee than in her left knee pain; bilateral medial compartment osteoarthritis- radiologic; weight 268 pounds. Knee arthroscopy and knee replacement surgery discussed (R: 279). On September 10, 2008, Dr. Frostic

---

[2] These numbers indicate Stage 1 Hypertension.
http://www.heart.org/HEARTORG/Conditions/HighBloodPressure/AboutHighBloodPressure/Understanding-Blood-Pressure-Readings_UCM_301764_Article.jsp
[3] Dr. Kneifel is Board Certified in Orthopedic Surgery. http://www.healthgrades.com/physician/dr-thomas-kneifel-2wtdp/background-check

noted that she was interested in bariatric surgery. Unsuccessful with weight loss attempts. Symptoms: Hypertension, obesity, sleep apnea, chronic low back pain, depression, osteoporosis, and chronic knee pain bilaterally. Weight 268 (last visit 272)(R: 280). Hypertension and peripheral edema. Her edema has cleared. Physical therapy is helping knee pain. Depression – stable on Wellbutrin. GERD (gastroesophageal reflux disease), asymptomatic on Prilosec. Obesity, unable to lose weight. Good candidate for surgery to help with low back pain, osteoarthritis of knees, foot pain, blood pressure, and sleep apnea (R: 281). There are physical therapy records from April to August 2008 (R: 320-326).

On October 22, 2008, Dr. Frostic noted her weight as 274 pounds. Hypertension, 148/92. Obesity (R: 486). She had a consultation regarding bariatric surgery. She has been trying to control her weight.  She gained 40 pounds after stopping smoking. She has found it difficult to walk. She is having chronic back and knee pain (R: 487). On October 28, 2008, Dr. Kneifel noted her right knee pain and bilateral medial compartment arthritis. Persisting right knee pain. Also having lumbar problems. Walking with a limp. Elected to proceed with Depo-Medrol right knee injection (R: 399).   On December 15, 2008, the x-ray indicated mild osteoarthritis of right knee (R: 290).

On February 4, 2009, Dr. Frostic noted her bilateral knee pain. Worsening pain in her right knee, less so in her left knee. Weight 282. Edema in both legs (R:

481). Depression, stopped Wellbutrin. She was more irritable and easily upset. Will go back on it (R: 483). On March 2, 2009, Dr. Frostic noted her bilateral knee pain and weight of 269 (R: 478).

On March 3, 2009, Dr. Kneifel noted her recurring knee injuries; bilateral knee pain, left worse than right and bilateral medial compartment arthritis. The last knee injection helped her pain. She fell a month ago and landed on both knees. Her pain is 9/10. Her last injection into right knee lasted for several months (R: 397). She elected to proceed with bilateral knee injections of Depo-Medrol (R: 398). On March 24, 2009, Dr. Frostic noted her weight as 260 pounds. She has lost 18 pounds in last six weeks. Knee pain. Cortisone injections to knees did not help. She has significant pain in both knees and cannot work. She does not have skills to do office work and cannot stand on her feet for eight hours a day. Considering bariatric surgery (R: 475). On April 6, 2009, Dr. Frostic noted her weight as 260 pounds. Depression. Problems with boyfriend (R: 472). Bilateral knee pain (R: 473). On April 22, 2009, Dr. Frostic noted her problems with her boyfriend. Referred to Clinton County Mental Health (CCMH). She is doing well in school. Depression. On Wellbutrin. Going to start on Zoloft (R: 470). On May 4, 2009, Dr. Frostic noted her severe osteoarthritis of right knee. She now has pain whenever she is walking in back of her right knee. Considering doing knee replacement (R: 467).

On May 12, 2009, Dr. Kneifel noted her persisting pain. The knee injections with Depo-Medrol did not give any relief. She discontinued physical therapy as symptoms were worsened. She notices some intermittent swelling. Referred to Dr. Black for consideration of Synvisc (R: 396). P.T. discharge summary of June 16, 2009 notes six visits, three cancellations (R: 336).

On November 16, 2009, the P.T. Evaluation notes her chronic knee pain. Aquatic therapy did not help, pain worsens with standing or sitting a long time or walking. Difficulty getting in and out of bed, low vehicles, low chairs and off floor. A week ago she went to E.R. for left foot pain. She has arthritis. Wearing immobilizer shoe since E.R. visit. Goal: to decrease pain. Bilateral knee pain. Antalgic gait, [4] difficult to tell if from foot or knees. Limited range of motion in left and right knees (R: 327).  Mild weakness and pain in both knees with testing, cannot do straight leg raise (SLR) without pain. Patient is very guarded. Decreased knee flexion due to pain. Problem list: "decreased ROM, strength and tolerance for WB [weight-bearing] activities." Functional deficits: Inability to work, or walk for distances greater than 300 feet (R: 328). P.T. records from 2008 and 2009 (R: 336-392).

---

[4] *antalgic gait:* a limp adopted so as to avoid pain on weight-bearing structures, characterized by a very short stance phase. http://medical-dictionary.thefreedictionary.com/antalgic+gait

On October 26, 2009, Dr. Kneifel stated that Hyalgan injection series improves her symptoms. She is not interested in surgery. She would like to revisit with Dr. Black to be reconsidered for another Hyalgan injection (R: 395). On November 9, 2009, Dr. Frostic diagnosed her with hypertension, obesity, bilateral knee pain, depression, sleep apnea, and GERD. Weight: 274. Difficult to walk up and down stairs. BP 162/84. Depression- doing well, we changed to Zoloft (R: 464).

On November 10, 2009, the x-ray showed left ankle heel spurs (R: 449). On November 10, 2009, she went to the CVPH E.R. for left foot pain and swelling (R: 453). On November 30, 2009, Dr. Kneifel noted her bilateral knee pain, left knee worse than right and bilateral medial compartment arthritis. Persisting knee pain. She is unable to tolerate the pain. Nonsurgical means have failed to alleviate her pain. Both knees have some joint crepitus and joint line tenderness. Arthroscopy versus joint replacement discussed. She elected to proceed with knee arthroscopy (R: 394).

On December 3, 2009, Dr. Kneifel operated on her left knee. Operative procedure: 1) Left knee arthroscopy with partial medial menisectomy, 2) Chondroplasty, medial femoral condyle, 3) Chondroplasty, lateral tibial condyle, 4) Anterior and medial synovectomy (R: 418). Post-Operative diagnosis: 1) Grade 2-3

Chondromalacia, [5] lateral compartment, 2) Grade 4 Chondromalacia, medial compartment, 3) Medial meniscus tear, degenerative, and 4) Synovitis, left knee (R: 418).

On December 15, 2009, twelve days after surgery, Dr. Kneifel noted that she was using a cane and has improved since surgery (R: 541). December 18, 2009, Dr. Darst noted her painful onychomycosis/onychocryptosis at the left great toe. Cut nail. Think about removing nail permanently (R: 546). Post-surgery P.T. Assessment, December 31, 2009. She has limited ROM, greater than at initial visit. Right knee ROM – 8 degrees to 108 degrees, left knee - 25 degrees to 85 degrees, with end range pain on both ends. She does not have a heel strike of her left heel when walking; she remains on her left toes (R: 571). There are more P.T. notes from January and February 2010 (R: 561-570).

On February 5, 2010, Dr. Brena at CVPH noted that she was distraught after her sister-in-law died last week. Grief reaction, difficult sleeping (R: 545). On February 12, 2010, ten weeks post-surgery, Dr. Kneifel noted that she is having knee pain, Taking Hydrocodone every four hours. Try injections. Stop narcotics

---

[5] "Chondromalacia" can be divided into 4 grades. *grade I*: * focal areas of hyperintensity with normal contour, * arthroscopically : softening or swelling of cartilage; *grade II:* * blister-like swelling/ fraying of articular cartilage extending to surface, * arthroscopically : fragmentation and fissuring within soft areas of articular cartilage; *grade III:* * partial thickness cartilage loss with focal ulceration, * arthroscopically : partial thickness cartilage loss with fibrillation (crab-meat appearance); and *grade IV:* * full thickness cartilage loss with underlying bone reactive changes, * arthroscopically : cartilage destruction with exposed subchondral bone. http://radiopaedia.org/articles/chondromalacia_grading

(R: 550). On February 22, 2010, Dr. Frostic noted that she is having a knee brace made, ordered by Dr. Kneifel. Continuing to have pain in left knee. She is hoping to recover and be able to go back to work. She is currently going to school, hoping to get some training so she can work with knee pain (R: 606). On February 23, 2010, discharge from Physical Therapy. She was fitted for a brace. Reached maximum therapeutic benefits from P.T. She is in constant pain. She continues to limp from pain (R: 557).

On March 10, 2010, Dr. Frostic noted that she was very tearful, crying easily. Feels things are closing in on her. She has a hard time getting out of bed in the morning. She missed school this week because of that (R: 604). On March 23, 2010, sixteen weeks post-surgery, Dr. Kneifel noted her persisting left knee pain. Tried physical therapy without relief. Wearing knee brace which is not helping. She is disappointed with her surgical results. She will eventually need a knee replacement. She will proceed with left knee injection (R: 549).

On March 31, 2010, Dr. Frostic noted her leg cramps, muscle cramps in both calves last two days, right worse than left. She has had some increase in depression and this has prevented her from being able to do her school work. Given note that she be released from school this semester due to medical illness (R: 600). On April 14, 2010, Dr. Frostic noted her knee problem. She had left knee arthroscopy, chondroplasty, meniscectomy, and synovectomy in past year. Considerable left

knee pain. Some right knee pain. Bilateral crepitus (R: 71). On April 30, 2010, Dr. Kneifel's impression was: Left knee pain with chondromalacia, 2) S/P knee arthroscopy with partial meniscectomy. Her pain comes and goes. She is using a knee brace (R: 617).

On May 11, 2010, at CVPH, Dr. Cruz noted her asthma, restless leg syndrome, depression, hypertension (R: 69) and acute bronchitis (R: 70). On July 23, 2010, CVPH noted her knee pain. She would rather find relief through exercise and conditioning than medications (R: 52). On June 25, 2010, CVPH noted her high blood pressure: 148/90 (R: 68).

On June 25, 2010, Dr. Kneifel stated that her right foot has been bothering her midfoot. She had a fracture in her midfoot two years ago. She also has some dysesthesias in the right foot and leg. This is worse with ambulation and when she initially gets up in the morning. Right midfoot has some diffuse tenderness, without evidence of deformity or swelling (R: 614). Regarding her left Achilles tendon, referred her to P.T. If this doesn't work, immobilization in equalizer boot and MRI might be considered. The right midfoot problem may be posttraumatic arthritis (R: 615). On June 25, 2010, the x-ray of right foot indicated a trace pes planus deformity. Small plantar calcaneal spur. Mild narrowing and osteophyte formation of the first MTP joint. Trace metatarsus primus varix and bunion formation at the head of the first metatarsal (R: 616).

On June 25, 2010, CVPH added Tramadol for pain (R: 56). On July 8, 2010, Dr. Begum at CVPH noted her history of Achilles tendonitis.  Pain in left Achilles tendon (R: 65). Hydrocodone for pain (R: 66). On July 12, 2010, CVPH noted her restless leg syndrome, GERD, osteoarthritis, depression, back pain, obesity, and hypertension.  Tramadol for pain (R: 54). On July 23, 2010, CVPH noted her muscle cramps (R: 63). On August 13, 2010, CVPH noted to restart CPAP (R: 62).

On October 1, 2010, psychiatrist Dr. Hinsman [6] diagnosed her attention deficit disorder (ADD) and dysthymia. [7] Strattera improves attention issues. Prescribing Lexapro for dysthymia (R: 61). On August 17, 2010, CVPH noted her bilateral foot pain, Achilles tendonitis (R: 60). On August 17, 2010, CVPH noted her pain and swelling bilateral feet and legs (R: 50). On October 1, 2010, Dr. Hinsman noted her ADD and dysthymia. Taking Strattara, Lexapro.  On November 12, 2010, Dr. Hinsman treated her for her ADD and dysthymia (R: 58). On March 25, 2011, Dr. Hinsman noted that she is doing well with Strattera and Lexapro. Her weight has increased about 20 pounds since starting medications. BP is 136/102 [8]

---

[6]  Dr. Hinsman specializes in psychiatry. http://www.healthgrades.com/physician/dr-david-hinsman-342p6/background-check

[7] "The American Psychiatric Association characterizes Dysthymia, or Dysthymic Disorder, as a chronic depression, but with less severity than a major depression. *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000." Stevens v. Barnhart, 473 F.Supp.2d 357, 363 n. 5 (N.D.N.Y. 2007).

[8] This is Grade 2 Hypertension.
http://www.heart.org/HEARTORG/Conditions/HighBloodPressure/AboutHighBloodPressure/Understanding-Blood-Pressure-Readings_UCM_301764_Article.jsp

(R: 85). On May 21, 2011, Dr. Hinsman noted that she is doing well, feeling concentration is quite satisfactory, depression seems to be relieved as well. She is comfortable with Strattera and Lexapro. They seem effective (R: 84). On May 28, 2011, Dr. Hinsman continued her Strattera and Lexapro. (R: 83).

On July 28, 2011, she had an acute visit with CVPH for left ankle pain, persistent for over 1 year. BMI (Body Mass Index): 45.69 (R: 46). On August 2, 2011, she had another acute visit for left ankle pain/swelling. She has had pain for about a year. The pain is constant (R: 39). The MRI showed Achilles tendonopathy with thickening and increased signal intensity with no tear. Extensive osteoarthritis involving the junction of the hindfoot and mid-foot as well as the junction of the mid-foot and forefoot (R: 42).

On September 14, 2011, Dr. Hinsman changed her diagnosis from depression to dysthymia and ADD (R: 80). On September 16, 2011, Dr. Hinsman continued her Lexapro, Strattera (R: 77).

On September 26, 2011, Dr. Masaba of CVPH noted her meniscus tear, knee pain, morbid obesity, hypertension, GERD, back pain, osteoarthritis, restless leg syndrome, Achilles tendonitis, dysthymia, and ADD (R: 75). On October 27, 2011, CVPH noted her right knee pain, left Achilles tendonitis, and foot in ankle brace (R: 34). BMI of 44.45 (R: 35). On November 3, 2011, CVPH noted her left knee pain for two years. Worse in last week. It hurts more when she walks or stands for

a long time. Pain is 7-8/10, throbs and at times sharp. Knee locks three to four times a day and when it opens it will pop. Patient is morbidly obese which puts a lot of pressure and physical stress on her knees (R: 30). Height: 63 inches. Weight is 248 pounds (R: 31). Recommended remaining out of work - out of work note provided (R: 32).

On November 7, 2011, the x-ray of left knee indicated advanced narrowing of the medial compartment joint space with moderate narrowing of the patellofemoral joint space. Marginal osteophyte formation of moderate severity is present involving all three compartment joint spaces. Moderate to advanced degenerative joint disease. There has been interval worsening in severity of degenerative joint disease in comparison to March 5, 2009 (R: 19). On November 11, 2011, the MRI of her left knee showed severe degenerative disease at the medial joint compartment with marginal spur formation and loss of cartilage. Vertically oriented flap tear involving posterior horn and body of the medial meniscus.  Moderate degenerative disease at the lateral joint compartment and mild degeneration at the patellofemoral joint. Mild to moderate loss of cartilage seen at the medial most aspect of the medial facet of the patella (R: 17).

On December 12, 2011, Dr. Masaba of CVPH diagnosed her with meniscus tear, morbid obesity, knee pain, screening for lipid disorder, hypertension, GERD, back pain, osteoarthritis, restless leg syndrome, Achilles tendonitis, dysthymia,

ADD. Medications: Lisinopril, Ventolin, Strattera, Lexapro, Volataren, Tylenol, Naprosyn, and Capsaicin (R: 15).

## C. Consultative exams:

On December 12, 2008, Dr. Wassef performed a consultative orthopedic examination for the Commissioner: Height: 5'4". Weight: 284. BP 136/84. She was in discomfort during exam of right knee. Diagnosis: Hypertension, asthma, sleep apnea, morbid obesity, lower back pain, osteoporosis, and bilateral knee pain. She was in discomfort during examination of her lower back (R: 286-288).

On December 12, 2008, psychologist Dr. Hartman performed a consultative exam for the Commissioner. She took special education classes in school and received her GED (R: 291). She reports mild sleep problems - five hours sleep a night. Weight gain of 22 pounds over last year. Feeling depressed lately. She reports sadness, irritability, concentration problems, racing thoughts, and anger. She snaps very quickly. She was abused as a child (and did not want to talk about it). Sometimes hypervigilant in public.  Her sister, mother, and daughter have been diagnosed as bipolar.  Her mother was very verbally abusive (R: 292). On exam, she was quite anxious. Mood mildly dysphoric. Intellectual functioning low average to borderline range (R: 293). She can care for herself, but has to take things slowly and take frequent breaks. She can understand simple instructions. Fair ability to maintain attention and concentration and maintain a regular

schedule, fair ability to make appropriate decisions. She appears to have a mild learning deficit. She would likely have difficulty performing a variety of tasks given her physical problems. She has mild to moderate problems dealing appropriately with normal stressors of life. Diagnosis: Adjustment disorder with mixed anxiety and depressed mood. Rule out learning disorder and pain disorder. Rule out borderline intellectual functioning. Prognosis: Fair to guarded given a combination of multiple symptoms (R: 294).

**D.  Other documents:**

*Disability Report*, August 5, 2008: Weight - 268, height - 5"4."  She can't lift more than 20 pounds or sit more than two hours. Onset date: February 1, 2006 (R: 243). "I can't stand for a period of time" (R: 254). She doesn't need help with household chores (R: 255). I can't sit for a long period of time with my ankles and right foot swelling. Must take breaks to elevate my legs. Also, it takes the pressure off my knees (R: 256). Limited lifting from osteoporosis in my back. Arthritis causes a lot of pain in knees if I stand any length of time. Kneeling hurts (R: 257). I need inserts for shoes for foot pain. Needs splint for right wrist. I have problems paying attention if there are distractions. Sometimes I can finish what she starts. I have a problem comprehending what I reads (R: 258). Stress or changes in schedules affects me. I have trouble with comprehension (R: 259). I have knee pain sitting for over an hour (R: 262).

## STANDARD OF REVIEW

When deciding an appeal from a denial of disability benefits, the Court of Appeals focuses on the administrative ruling rather than the district court's opinion. Schaal v. Apfel, 134 F.3d 496, 500-01 (2d Cir. 1998). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).

This deferential standard of review is not applicable to the Commissioner's conclusions of law. Failure of the Commissioner to apply the correct legal standards is grounds for reversal of an ALJ decision, even if it supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

In determining whether the appropriate legal standards were applied and whether substantial evidence supports the Commissioner's findings, the Court shall

review the ALJ's decision, the hearing transcript and the entire administrative record, including any objective medical evidence as well as the plaintiff's subjective statements concerning his impairments, restrictions, daily activities and any other relevant statements. <u>Parker v. Harris</u>, 626 F.2d 225, 231 (2d Cir.1980). In <u>Vargas v. Sullivan</u>, 898 F.2d 293, 296 (2d Cir. 1990)(emphasis added, citations omitted), the Second Circuit explained the "substantial evidence" test in the context of Social Security appeals:

> Although this process of review calls for deference to the Secretary's decision, we must remember that " 'the Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion.'" . . . It must have been as obvious to the A.L.J. as it is to us that there was an infinitesimal likelihood that employment of any kind would be available for the sickly, uneducated, illiterate, inexperienced, 45-year-old claimant. Bearing in mind the expressed intent of the Act, we do not understand why the A.L.J. ignored or misinterpreted the report and conclusions of the attending physician . . . in the grudging manner that he did. In short, we conclude that the A.L.J.'s finding of no disability was not supported by substantial evidence.

## ARGUMENT

**I.  Appellant is disabled under the Statute and Regulations as a matter of fact and law because the Commissioner did not meet *her* burden of proof at Step Five that Appellant could perform work in the national economy.**

An individual is eligible for disability benefits under the Act if she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

24

death or which has lasted or can be expected to last for a continuous period of not less than twelve months. An individual's impairment must be of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 20 CFR § 404.1505.

The Commissioner has promulgated a five-step process for evaluating disability claims: Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); 20 C.F.R. §§ 404.1520, 416.920. The ALJ *must* evaluate (1) whether the claimant has shown she is not currently performing any "substantial gainful activity"; (2) whether the claimant's impairment is severe and meets the duration requirement; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to subpart P of part 404; (4) whether the claimant's impairment prevents her from performing her past work; and (5) whether the claimant is able to perform other work of the sort found in the national economy.

If the SSA concludes that a claimant's medical condition does not meet or equal the listings of impairments, steps 4 and 5 of the five step sequential evaluation process for determining entitlement to benefits requires the SSA to consider the claimant's residual functional capacity (RFC). This is the range of activity that she can perform in spite of her impairment. State of N.Y. v. Bowen,

655 F.S. 136 (S.D.N.Y. 1987), aff'd, 906 F.2d 910 (2nd Cir. 1990). The burden of proof is upon the Commissioner to show that a claimant who cannot perform her previous work is able to perform other work in the economy. Berry v. Schweiker, 675 F.2d 464,467 (2d Cir. 1982)(per curiam).

In the instant case, the ALJ found that Ms. Polynice met the first four steps of the five-step evaluation. At Step 4, he correctly determined that she did not have the residual functional capacity (RFC) to perform her past work. However, at Step 5, the ALJ erroneously found that Ms. Polynice is able to perform work in the national economy.

## II.     The ALJ erred in not fully crediting Ms. Polynice's testimony regarding her limitations without clear and convincing evidence.

Pursuant to 42 U.S.C. § 423(d)(5)(A) and 20 C.F.R. § 404.929, after a claimant shows the existence of a medical impairment through objective evidence, an ALJ *must* consider the claimant's subjective testimony of the severity of the pain, whether or not the subjective testimony is supported by objective evidence. Snell v. Apfel, 177 F.3d 128 (2d Cir. 1999); McLaughlin v. Secretary of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980). If the objective medical evidence "could reasonably be expected to produce the pain or other symptoms alleged . . ." then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. 20 C.F.R. §§ 416.929(a) & (c).

An ALJ must provide *specific* reasons for rejecting subjective evidence of pain. Toro v. Chater, 937 F.Supp. 1083 (S.D.N.Y. 1996); Melchior v. Apfel, 15 F.Supp.2d 215 (N.D.N.Y. 1998). "Absent evidence of malingering, the ALJ is required to accept the claimant's testimony. In failing to assign a claimant substantial credibility, the ALJ is required to make specific findings, including a *clear and convincing* rationale for the rejection, stating which testimony is not credible and what facts in the record lead to that conclusion." Goldthrite v. Astrue, 535 F.Supp.2d 329, 336 (W.D.N.Y.2008)(citations omitted). In any event, when the subjective testimony of pain and disability given by claimant is consistent with the objective medical facts and the experts' opinions, a finding of poor credibility is not even supported by substantial evidence. Williams v. Bowens, 859 F.2d 255, 261 (2d Cir. 1988).

In Ceballos v. Bowen, 649 F.Supp. 693 (S.D.N.Y. 1986), the court held that the ALJ erred by rejecting the assertions of pain even though there was evidence of a herniated disc. It explained that the claimant only needed to show the lower back pain could be shown to result from the medical impairment – a herniated disc. See also, Torres v. Bowen, 700 F.Supp. 1306 (S.D.N.Y. 1988); Shane v. Chater, 1997 WL 426203 (N.D.N.Y.1997); 165 ALR Fed 203, "Standard and Sufficiency of Evidence When Evaluating Severity of Pain in Social Security Disability Case Under § 3(a)(1) of Social Security Benefits Reform Act of 1984, 42 U.S.C.A. § 423(d)(5)(A)," §§ 10[a], pp. 281-297, § 11[a], § 31[a], and 55[a] (for numerous

citations to Second Circuit cases reversing denials without consideration of back pain, buttock pain, or leg pain).

The ALJ must set forth his reasons for discounting claimant's subjective complaints with "sufficient specificity to enable [the district court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1987). Where an ALJ has not provided sufficient authority for his conclusions, the reviewing court may not affirm his decision. Lunan v. Apfel, 1999 U.S.Dist.LEXIS 21363, *17 (N.D.N.Y.1999), aff'd, 2000 U.S.Dist.LEXIS 3024 (N.D.N.Y.2000)(J. Mordue); Batista v. Chater, 972 F.Supp. 211, 222 (S.D.N.Y. 1997). The mere incantation that the record lacks objective medical evidence to corroborate plaintiff's testimony "without more, cannot serve as a magic elixir to remedy an administrative record that is otherwise deficient in evidence discounting plaintiff's credibility." Reed v. Secretary of HHS, 804 F.Supp. 914, 922 (E.D.Mich. 1992). A "boilerplate" finding that the testimony was "credible only to the extent that it was supported by evidence of record" is an insufficient explanation of credibility. F.S. v. Astrue, 2012 U.S. Dist. LEXIS 18865, * 53  (N.D. N.Y.2012)(J. D'Agostino).

In Fragale v. Chater, 916 F.Supp. 249, 252-53 (W.D.N.Y.1996), the court recited the legal standard for determining the credibility of a claimant:

> [I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough

> discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work ....

SSR 95-5p, 1995 WL 670415(SSR) at *2.

In Balsamo v. Chater, 142 F.2d 75, 81-82 (2d Cir. 1998), the Second Circuit held that an ALJ errs by citing non-substantial evidence to attack the credibility of a claimant on the question of disability. "A claimant need not be an invalid to be found disabled" under the Social Security Act. Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988). See, Dailey v. Barnhardt, 277 F.Supp.2d 226 (W.D.N.Y.2003)(the court held that performance of some activities despite pain cannot be used to discredit a claimant).

In Craig Genier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010), this Court held:

> Before finding that Genier was not a credible reporter of his own limitations, the ALJ was required to consider all of the evidence of record, including Genier's testimony and other statements with respect to his daily activities. 20 C.F.R. § 404.1529, 404.1545(a)(3). The decision, however, was based on so serious a misunderstanding of Genier's statements that it cannot be deemed to have complied with the requirement that they be taken into account. The ALJ wrote that Genier "indicated in a questionnaire dated May 11, 2006 that he was able to care for his dogs, vacuum, do dishes, cook, and do laundry." In fact, Genier indicated on the questionnaire that he *tried* to care for his dogs, "to do thing[s] around house, like dishes[,] vacuum[,] etc.," and to do his laundry, but that he required the assistance of a parent for each of these tasks because of his severe fatigue.

In his Decision, ALJ Farrell made the following credibility determination for

Ms. Polynice:

> According to her testimony and records in support of her application
> for benefits, the claimant initially alleged that she could lift 20 pounds
> and could sit for 2 hours at one time. She alleged a few months later
> on her Appeals Report that she could sit for only 10 or 15 minutes at a
> time and could not walk. At the hearing, she alleged that she could sit
> for 2 to 3 hours but would need to keep moving and could stand for 15
> to 20 minutes. She could walk for five minutes before needing to sit
> for a short time before continuing on her walk. The Administrative
> Law Judge has considered all the evidence contained in the file and
> finds the claimant's original statements to be the most credible and
> most consistent with the evidence of record and the residual functional
> capacity assessment has been composed to reflect these abilities.

(R: 95).

> After careful consideration of the evidence, the undersigned finds that
> the claimant's medically determinable impairments could reasonably
> be expected to cause the alleged symptoms; however, the claimant's
> statements concerning the intensity, persistence and limiting effects of
> these symptoms are not credible to the extent they are inconsistent
> with the above residual functional capacity assessment. [9]

(R: 96). The ALJ held that her:

> complaints of chronic back pain since 2005 are not supported by the
> medical record. There is little in the record to substantiate the
> claimant's complaints of back pain and little if anything in the way of
> objective findings that would support a serious back problem

(R: 97).

---

[9] However, the ALJ did state that her testimony as to her limitations as a result of her knee
problem is credible (R: 97).

In fact, the medical records notes from the CVPH Clinic note her chronic low back pain in June 2008, September 2008, October 2008, June 2010, September 2011 and December 2011. The Commissioner's own consultant, Dr. Wassef noted that she had low back pain during his examination. The record clearly shows that her conditions deteriorated after she applied in September 2008. Further, the ALJ does not provide a clear and convincing explanation why her statements concerning the intensity, persistence, and limiting effects of her symptoms are inconsistent with his RFC assessment. To the extent that the ALJ found inconsistencies between her written statements and her testimony, he should have sought an explanation from Mr. Polynice. Fox v. Astrue, 2008 U.S.Dist.LEXIS 24459, * 39 (N.D.N.Y. 2008)(C.J.Mordue).

If the ALJ credited the testimony of Ms. Polynice regarding her limitations, he would have necessarily found her to be disabled. Because his credibility determinations were not supported by clear and convincing evidence, this Court should reverse and remand for payment of benefits.

**III.    Ms. Polynice is disabled by Listing 1.02 and/or 1.03 because her severe knee problems prevent her from ambulating effectively.**

A person is presumptively disabled if they meet Listings 1.02 *or* 1.03:

*1.02 Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of

joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00(B)(2)(b);

> *1.03. Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint*, with inability to ambulate effectively, as defined in 1.00(B)(2)(b), and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

See, e.g., Little v. Heckler, 787 F.2d 591 (6th Cir. 1986). Regulation 1.00(B)(2)(b)

provides:

> *What We Mean by Inability to Ambulate Effectively* (1) *Definition*. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

> (2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

In <u>Lewis v. Apfel</u>, 236 F.3d 503, 512 (9th Cir. 2001), the Ninth Circuit held: "An ALJ *must* evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." In <u>Petit v. Astrue</u>, 2012 U.S.Dist.LEXIS 129425, *11 - * 12 (C.D.Cal. 2012), the court recently held that the ALJ erred by not even mentioning Listing 1.03 in evaluating a claim involving the ability to ambulate effectively: "In any event the ALJ's finding was a conclusory, boilerplate finding with no discussion at all and does not even mention Listing 1.03."

It is uncontroverted that Ms. Polynice suffers from chondromalacia and severe osteoarthritis in her knees. In <u>Gray v. Astrue</u>, 2009 U.S.Dist.LEXIS 23610, * 10 n. 12 (N.D.N.Y. 2009)(C.J. Mordue), the court cited Dorland's Medical Dictionary and defined chondromalacia as "pain in the anterior aspect of knee with flexion with a softening of articular cartilage." Grade IV chondromalicia is the most severe type. <u>Osborn v. Astrue</u>, 2010 U.S.Dist.LEXIS 115139, * 15 (W.D.Wash. 2010), <u>adopted by</u>, 2010 U.S.Dist.LEXIS 115270 (W.D.Wash. 2010).

The medical records indicate that Ms. Polynice has severe osteoarthritis in both knees. She had unsuccessful surgery on her left knee in December 2009. She continued to have pain and limitations in ambulating in March 2010. Her orthopedic surgeon opined that she would need a knee replacement. Also, Ms.

Polynice continued to have pain and limitations in her right knee because of the severe osteoarthritis.

In addition, the record indicates she reported severe right foot pain in 2010 and left foot and ankle pain. The examinations and radiological tests provide objective bases for this pain. She consistently reported limitations in ambulation. She testified that she could only walk for five to ten minutes (R: 126). She was unable to attend classes in 2010 because of her inability to ambulate (R: 600).

Ms. Polynice is *prima facie* disabled under Listings 1.02 and 1.03. The ALJ erred by not even *considering* these Listings in his decision. Even if she does not fully meet the Listings, her limited functional capacity for ambulation, in combination with her other exertional and non-exertional limitations, prevents her from working on a full-time sustained basis.

## IV.   The ALJ violated the treating physician rule in denying benefits to Appellant.

Under 20 CFR § 404.1527(d)(2), the SSA must give more weight to the opinions of treating doctors than to those of the consulting doctors. The opinion of the treating doctor must be given controlling weight unless it is found that this opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is not consistent with the other substantial evidence in the record. The rule provides:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

When the ALJ does not give controlling weight to the treating physician's opinion, he must apply several factors to determine its weight. These factors include:

> 1) the source's knowledge about the claimant's impairments based the length, nature, and extent of treatment;
> 2) evidence, particularly in the form of medical signs and laboratory findings, that supports the source's opinion;
> 3) the source's opinion is consistent with other evidence in the record; and/or
> 4) the source's opinion is about medical issues related to his/her specialty.

20 C.F.R. §§ 404.1527(d)(2)(i), (d)(3), (d)(4), and (d)(5). See, Brown v. Apfel, 991 F.Supp. 166, 171-172 (W.D.N.Y. 1998).

The Second Circuit addressed the treating physician rule in Balsamo v. Chater, 142 F.3d 75, 80-81 (2d Cir. 1998). In that case, the ALJ rejected the treating physicians' opinions on the basis that they conflicted with the clinical findings. The Court held (citations omitted):

> The treating physician's opinion on the subject of medical disability, i.e., diagnosis and nature and degree of impairment, is: (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians. . . .
>
> . . . In the absence of a medical opinion to support the ALJ's finding as to Balsamo's ability to perform sedentary work, it is well-

settled that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion .... While an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." . . .

The weight to be given a non-testifying, non-examining physician, when compared to contrary evidence given by a treating physician, is to be substantially discounted. 20 CFR 404.1527(d)(1); Gonzalez v. Callahan, 1997 U.S.Dist.LEXIS 5208 (S.D.N.Y.1997). In Hilton v. Apfel, 1998 WL 241616, *9 - * 11 (S.D.N.Y. 1998), the court held the ALJ erred in rejecting the medical opinions of the treating doctors for those of the consulting doctors.

The regulations and the case law hold that the results of well-established clinical tests are "objective" evidence of pain. See e.g., Mangual v. Pleas, 2005 U.S.Dist.LEXIS 19785, * 19 (S.D.N.Y. 2005); White v. Barnhardt, 336 F.Supp. 2d 1183, 1189 (N.D.Ala. 2004)(x-rays, tenderness, decreased range of motion, palpable muscle spasms, MRI, positive straight leg raise, manipulation, and direct pressure all considered to be objective evidence of pain); Groat v. Barnhardt, 282 F.Supp.2d 965, 972 (S.D.Iowa 2003)(straight leg raise considered objective evidence);  Maya v. Apfel, 1999 U.S.Dist.LEXIS 6248, * 19 (E.D.N.Y. 1999)(clinical exams revealing continuing pain, positive straight leg raises, moderate muscle spasms, and restricted range of motion are objective medical

evidence); <u>Scalzo v. Heckler</u>, 652 F.Supp. 530, 538 (D.R.I. 1987)(results of physical examination by M.D. represent objective medical evidence).

In the instant case, Ms. Polynice's treating orthopedic surgeon, Dr. Kneifel, and her treating physicians at the CVPH Clinic provide conclusive support for her physical impairments and limitations. The pain in her feet, knees, and low back is well documented. Her morbid obesity (and its effect on her orthopedic conditions) is well noted. Her sleep apnea, asthma, GERD, and *uncontrolled* Grade 1 and Grade 2 hypertension are all noted. The physical therapy report noted that she had a positive straight leg raise [10] (R: 327).

Her treating psychiatrist, Dr. Hinsman, diagnosed her with attention deficit disorder and dysthymia. The Commissioner's own consultant, Dr. Hartman, diagnosed her with adjustment disorder with mixed anxiety and depressed mood, rule out learning disorder, rule out pain disorder, rule out borderline intellectual functioning.

The ALJ determined: "The medical evidence of record indicates that she suffers from depression on a situational basis rather than a chronic basis. . ." (R: 98). Neither Dr. Hinsman nor Dr. Hartman determined that her mental illness was

---

[10] The straight leg raise is considered to be an objective test of radiculopathies in the lower extremities. <u>See, e.g.,</u> Health Information Center, Cleveland Clinic, Dr. Gordon Bell, <u>http://www.spineuniverse.com/displayarticle.php/article3072.html</u>

situational rather than chronic. The ALJ erred by substituting his diagnosis for that of the treating and consulting doctors.

The opinions and findings of the treating physicians show that Ms. Polynice is disabled by her physical and mental disabilities. The ALJ erred by not giving sufficient weight to these opinions and findings.

**V.     The ALJ erred in concluding that Ms. Polynice had the residual functional capacity ("RFC") to perform work despite her *combination* of exertional limitations and non-exertional limitations of pain, morbid obesity, and mental illness.**

In <u>Dixon v. Shalala</u>, 54 F.3d 1019 (2d Cir. 1995), the Second Circuit ruled that the SSA *must* consider disabilities in combination in determining the severity of the impairment(s). Nonexertional, as well as exertional, limitations must be considered by the ALJ. <u>Jacob v. Shalala</u>, 872 F.Supp. 1166 (E.D.N.Y. 1994). "'A claimant's illness must be considered in combination and not fragmentized in evaluating their efforts . . . The fact that each illness standing alone may not be disabling is not conclusive on the question of whether the individual is disabled.'" <u>Dilligard v. Bowen</u>, 1989 U.S.Dist.LEXIS 3520, * 7 (S.D.N.Y. 1989)(citations omitted).

Social Security regulations define residual functional capacity as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs."  20 C.F.R. Pt. 404, Subpt.  P, App. 2 § 200.00(c).  In evaluating whether a claimant satisfies the

disability criteria, the Commissioner must evaluate the claimant's "ability to work on a sustained basis."  20 C.F.R. § 404.1512(a); Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1995).  The regulations further specify:  "When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis."  § 404.1545(b).   "Occasional symptom-free periods--and even the sporadic ability to work-are not inconsistent with disability."  Lester v. Chater, 81 F.3d at 833.

> The regulations define sedentary work at 20 CFR § 404.1567:
>
> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

SSR 96-9R discusses sedentary work:

> *Standing and walking:* The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8-hour workday. If an individual can stand and walk for a total of slightly less than 2 hours per 8-hour workday, this, by itself, would not cause the occupational base to be significantly eroded. Conversely, a limitation to standing and walking for a total of only a few minutes during the workday would erode the unskilled sedentary occupational base significantly. For individuals able to stand and walk in between the slightly less than 2 hours and only a few minutes, it may be appropriate to consult a vocational resource.

*Sitting:* In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded. The extent of the limitation should be considered in determining whether the individual has the ability to make an adjustment to other work. See *Alternate sitting and standing* below.

The fact that an individual cannot do the sitting required to perform the full range of sedentary work does not necessarily mean that he or she cannot perform other work at a higher exertional level. In unusual cases, some individuals will be able to stand and walk longer than they are able to sit. If an individual is able to stand and walk for approximately 6 hours in an 8-hour workday (and meets the other requirements for light work), there may be a significant number of light jobs in the national economy that he or she can do even if there are not a significant number of sedentary jobs.

*Alternate sitting and standing:* An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

The ability to work only a few hours a day or to work only on an intermittent basis is not the ability to engage in 'substantial gainful activity.' Complete helplessness is not necessary to a finding of an allowable disability. Mazzella v. Secretary of United States Dep't of Health and Human Services, 588 F.Supp. 603,

608 (S.D.N.Y. 1984). "To be capable of performing sedentary work under the guidelines, an individual must have some reasonable chance in the real world of being hired, and once hired, of keeping the job." <u>Genier v. Astrue</u>, 298 Fed.Appx. 105, 107 (2d Cir. 2008). The term "substantial gainful activity" means the performance of substantial services with reasonable regularity in some competitive employment. <u>Derienzas v. Heckler</u>, 748 F.2d 352 (2d Cir. 1984).

In the Second Circuit, a person who can only sit for short periods of time is not considered capable of performing sedentary work. <u>Carroll v. Sec. of HHS</u>, 705 F.2d 638 (2nd Cir. 1983) (because of arthritis the claimant could only sit for short periods of time). In <u>Gibbons v. Bowen</u>, 653 F.Supp. 1478 (S.D.N.Y. 1987), the evidence was that the claimant could alternately sit or stand for two hours at one time. The court found that the claimant could not perform sedentary work or return to his prior job that requires continuous periods of sitting or standing in excess of the one and one half-hours of which he was capable. <u>See also</u>, <u>Burgo v. Harris</u>, 1981 U.S. Dist. LEXIS 16406 (E.D.N.Y. 1981)(claimant could only sit for 60 minutes and then had to lie down for long periods of time); <u>Deutsch v. Harris</u>, 511 F.Supp. 244 (S.D.N.Y. 1981)(need to alternate between sitting and standing precludes ability to perform sedentary work); <u>Ghazibayat v. Schweiker</u>, 554 F.Supp. 1005 (S.D.N.Y. 1983)(claimant could only sit for a few minutes at a time); <u>Ianiro v. Schweiker</u>, 1983 U.S.Dist.LEXIS 18095 (E.D.N.Y. 1983)(claimant could

only sit for one-half hour); Keppler v. Heckler, 587 F.Supp. 1319 (S.D.N.Y. 1984)(inability to sit for more than two hours due to lower back injury); Minuto v. Sec. of HHS, 525 F.Supp. 262 (S.D.N.Y. 1981) (inability to sit for more than two hours due to back injury); O'Grady v. Heckler, 588 F.Supp. 850 (E.D.N.Y. 1984)(inability to sit more than one hour due to cervical and lumbar spine syndrome); Rivera v. Heckler, 618 F.Supp. 1173 (E.D.N.Y. 1985)(claimant unable to walk more than two hours, stand for more than one hour, or sit for more than four hours; potential for rehabilitation not evidence of present ability to do sedentary work).

In the instant case, Donna Polynice has been unable to perform even sedentary work because of the combination of her inability to ambulate effectively, her pain, her obesity, her hypertension, and her mental illness.

### a. Donna Polynice did not have the RFC to perform work because of her non-exertional limitation of pain.

An ALJ must consider the effects of non-exertional limitations, such a pain, in determining whether a person is able to work. Rosa v. Callahan, 168 F.3d 72 (2d Cir. 1999). In the instant case, there is overwhelming objective evidence supporting Ms. Polynice's consistent reports of pain. Pain is, by its very nature, subjective. The ALJ erred by failing to credit her subjective testimony of pain, even though it was *supported* by objective medical evidence. She credibly testified to her limitations in walking, sitting, standing, lifting, bending, and performing

activities of daily living because of severe pain. The ALJ did not correctly consider the limitations caused by her severe pain in determining her residual functional capacity.

### b. Donna Polynice was disabled by her morbid obesity (in combination with her spinal disorder and other non-exertional impairments).

The Regulations, at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(q)

provide:

> *Effects of obesity.* Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. *The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.* Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

(emphasis added). Social Security Ruling SSR No. 02-01p, 2002 SSR LEXIS 1, *

4- * 5 defines Obesity as follows:

> The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

The Ruling goes on to provide:

We will also find that a listing is met if there is an impairment that, *in combination with obesity*, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of *musculoskeletal* . . . impairments. It may also be true for other coexisting or related impairments, including *mental disorders*.

Id. at * 12 - * 13 (emphasis added).

In LeFaucher v. Colvin, 2013 U.S.Dist.LEXIS 45375, **\*** 19 **-** **\*** 20 (N.D.N.Y. 2013)(J. Kahn), the district court reviewed SSR 02-01p. It held:

The ALJ briefly stated that although it is likely that [p]laintiff's obesity may further limit her ability to perform work-related activities, "the evidence does not support a finding that she is more limited than that found in the established residual functional capacity." . . . The ALJ's failure to elaborate further and address [p]laintiff's obesity when determining her residual functional capacity supports [p]laintiff's assertion that the ALJ's determination at all steps of the evaluation process is not supported by substantial evidence. Therefore, the Court remands this matter to the ALJ to provide a complete analysis of how [p]laintiff's obesity would affect her RFC at all five steps.

In another recent Northern District of New York case, Shutts v. Colvin, 2013 U.S.Dist.LEXIS 113930, * 11  (N.D.N.Y. 2013)(J. Suddaby) "the ALJ made no mention of obesity in his decision and (apparently) did not assess whether Plaintiff's obesity, in combination with his other impairments, limited his ability to perform work." The plaintiff had a BMI between 35.9 and 39.9. [11]   Id. at 13. The district court noted:

---

[11] A recent LEXIS search for Northern District cases using the terms "obesity" & "social security" & BMI yields 13 other cases. Remands were granted by that court in 11 of these Social

To be sure, there is caselaw to support the premise that an ALJ's failure to address obesity is harmless where Plaintiff's treating providers were aware of his weight problem and presumably incorporated that issue when assessing his limitations. See, e.g., Guadalupe v. Barnhart, No. 04-CV-7644, 2005 U.S. Dist. LEXIS 17677, 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citing Skarbek v. Barnhart, 390 F.3d 500, 504, 105 Fed. Appx. 836 (7th Cir.2004)) (reasoning that the ALJ "relied on" medical evidence that made no mention that plaintiff was obese even though it must have been apparent at the time of the assessment and thus the ALJ "sufficiently, if somewhat indirectly, accounted for plaintiff's obesity"); Martin v. Astrue, No. 5:05-CV-72, 2008 U.S. Dist. LEXIS 73767, 2008 WL 4186339, *3-4, 11-12 (N.D.N.Y. Sept. 9, 2008) (finding ALJ's failure to explicitly address plaintiff's obesity harmless error, because the ALJ "utilized" the physical limitations from various doctors who considered plaintiff's obesity); but see Hogan v. Astrue, 491 F. Supp. 2d 347, 355 (W.D.N.Y.2007) (finding error even though the ALJ found plaintiff's obesity a severe impairment, because it was "unclear whether he considered plaintiff's obesity at steps four and five of the disability evaluation").

---

Security appeals, with BMIs ranging from 33 to 58.5. The District Court denied the appeals in two cases (with BMIs of 39.9 and 62.5). See, Martin v. Colvin, 2013 U.S. Dist. LEXIS 69214 (N.D.N.Y. 2013)(BMI of 58.5, remanded); Jones v. Colvin, 2013 U.S. Dist. LEXIS 47271 (N.D.N.Y. 2013), adopted by, 2013 U.S. Dist. LEXIS 45380 (N.D.N.Y, Mar. 29, 2013)(BMI of 39.9, remanded); McKeavitt v. Astrue, 2012 U.S. Dist. LEXIS 138320 (N.D.N.Y. 2012); Chavis v. Astrue, 2012 U.S. Dist. LEXIS 176016 (N.D.N.Y. 2012), adopted by, 2012 U.S. Dist. LEXIS 175119 (N.D.N.Y. 2012)(BMI 45.4, appeal denied); Garcia v. Astrue, 2012 U.S. Dist. LEXIS 98369 (N.D.N.Y. 2012), adopted by, 2012 U.S. Dist. LEXIS 98372 (N.D.N.Y. 2012)(BMI of 37.5, remanded); Lackner v. Astrue Comm'r of Soc. Sec., 2011 U.S. Dist. LEXIS 65200 (N.D.N.Y. 2011), adopted by, 2011 U.S. Dist. LEXIS 64938 (N.D.N.Y. 2011)(BMI of 33, remanded); Cornell v. Astrue, 764 F. Supp. 2d 381 (N.D.N.Y. 2010)(BMI of 42.2, remanded); Rienhardt v. Astrue, 2009 U.S. Dist. LEXIS 126238 (N.D.N.Y. 2009), adopted by, 2010 U.S. Dist. LEXIS 28754 (N.D.N.Y. 2010)(BMI of 46.6, remanded); Hunt v. Astrue, 2009 U.S. Dist. LEXIS 117620 (N.D.N.Y. 2009), adopted by, 2009 U.S. Dist. LEXIS 117440 (N.D.N.Y. 2009)(BMI of 56, remanded); Sellie v. Astrue, 2009 U.S. Dist. LEXIS 80646 (N.D.N.Y. 2009)(BMI of 62.5, appeal denied); Hulbert v. Comm'r of Soc. Sec., 2009 U.S. Dist. LEXIS 77508 (N.D.N.Y. 2009), adopted by, 2009 U.S. Dist. LEXIS 78103 (N.D.N.Y. 2009)(BMI of 41, remanded); Rockwood v. Astrue, 614 F. Supp. 2d 252 (N.D.N.Y. 2009), adopted by, 2009 U.S. Dist. LEXIS 36528 (N.D.N.Y, Apr. 30, 2009)(BMI of 38.8, remanded); Shaver v. Comm'r of Soc. Sec., 2008 U.S. Dist. LEXIS 51570, (N.D.N.Y. 2008)("high BMI," remanded).

Shutts, at * 13 - * 14. The court held that the ALJ's failed to adequately address whether obesity, in combination with the plaintiff's other impairments, prevented him from working.  It remanded so that the ALJ could determine the impact of plaintiff's obesity in accordance with SSR 02-01p. See also, Caballero v. Barnhardt, 2003 U.S.Dist.LEXIS 19485 (E.D.Pa. 2003)(obesity can be considered objective evidence to support reports of pain).

In 2008, Dr. Frost stated: "[Donna Polynice's] weight contributes greatly to symptoms of the lower extremities" (R: 500). He opined: "Good candidate for [bariatric] surgery to help with low back pain, osteoarthritis of knees, foot pain, blood pressure, and sleep apnea." (R: 281). He noted that, because of her obesity: "She has found it difficult to walk. She is having some chronic back pain and knee pain and also is hypertensive" (R: 487). In 2011, Dr. Masaba stated: "Patient is morbidly obese which puts a lot of pressure and physical stress on her knees."

It is uncontroverted that Ms. Polynice suffers from Level III morbid obesity, [12] with a BMI of 48.7. [13] The ALJ merely stated her obesity was a severe impairment. He found that the obesity *complicates* her knee impairment (R: 93). However, he did not evaluate the extent to which her morbid obesity *and*

---

[12] "Morbid obesity is defined as weighing more than two (2) times the ideal weight and is associated with many serious and life-threatening disorders. Dorland's Illustrated Medical Dictionary ("DIMD"), 28th Ed. (1994) at 1166." Terry v. Astrue, 2010 U.S.Dist.LEXIS 131164, * 9 (W.D.Va. 2010)(Social Security appeal remanded with BMI of 47).
[13] Based upon her height of 5'4" and 284 pounds during her examination by Dr. Wassef.

orthopedic limitations impaired her and whether together they met Listings 1.02 and 1.03. He also did not evaluate the effect of her morbid obesity on her pain.

### c. Donna Polynice was unable to work because of her non-exertional psychiatric impairments in combination with her other impairments.

The rules, at 20 CFR Subpart P., App. 1, § 12.04 provide that a person can be disabled because of an Affective Disorders (depression). Even if Ms. Polynice does not meet this listing, her depression and ADD are non-exertional limitations which must be considered by the Commissioner in combination with her other physical impairments. Brown v. Barnhardt, 418 F.Supp.2d 252 (W.D.N.Y. 2005). The ALJ did not correctly identify her psychiatric limitations in presenting his hypothetical to the vocational expert. There is no evidence that a person with Ms. Polynice's psychiatric disorders and physical impairments could perform any work on a full time, sustained basis.

## VI.    The ALJ erred in rejecting the vocational expert's testimony that Ms. Polynice could not work under the hypotheticals that were an accurate depiction of her limitations.

The ALJ may consult a vocational expert to "testify about the existence of jobs in the national economy and about the claimant's ability to perform any of those jobs given [his] functional limitations." Leonard v. Comm'r of Soc. Sec., No. 5:05-CV-1084, 2008 U.S. Dist. LEXIS 60900, *23 (N.D.N.Y. Aug. 7, 2008) (citation omitted). A vocational expert's testimony, however, is "only useful if it addresses whether the particular claimant, with his limitations and capabilities, can

realistically perform a particular job." <u>Aubeuf v. Schweiker</u>, 649 F.2d 107, 114 (2d Cir. 1981) (citation and footnote omitted). As such, an ALJ's hypothetical question must "present the full extent of a claimant's impairments" to "provide a sound basis for the vocational expert testimony[.]" <u>Bonifacio v. Comm 'r of Soc. Sec.</u>, No. 11-CV- 779, 2012 U.S. Dist. LEXIS 109011, *9 (N.D.N.Y. Aug. 3, 2012).

A vocational expert's opinion that a claimant can perform light and/or sedentary work must be supported by medical evidence that he had the physical functional capacity to perform such work. In <u>Felicie v. Chater</u>, 1996 U.S.Dist.LEXIS 22004 (S.D.N.Y. 1996) the court held:

> The ALJ found that plaintiff had the RFC to do a partial range of light work and that plaintiff's prior work was within that range. Although the record does not clearly describe the nature and requirements of this work, a security guard must remain alert and be able to respond rapidly in an emergency. . . . In reaching his decision, the ALJ failed to evaluate plaintiff's condition in light of this requirement.

In <u>Diaz v. Astrue</u>, 2012 U.S.Dist.LEXIS 125708 (D.Conn. 2012)(D.J. Bryant), the court remanded to reconcile the difference between the vocational expert's testimony and the job requirements as listed in the Dictionary of Occupational Titles ("DOT"). The ALJ failed to ask the expert whether any of the jobs identified could be performed considering the actual reasoning development of the claimant.

In the instant case, in response to the ALJs two hypothetical questions, the Vocational Expert identified three jobs that the hypothetical person could do:

account clerk, addresser, and order clerk. The Dictionary of Occupational Titles

("DOT") description for Charge Account Clerk: No. 205.367-014 is as follows:

> Interviews customers applying for charge accounts: Confers with customer to explain type of charge plans available. Assists customer in filling out application or completes application for customer. Reviews applications received by mail. Files credit applications after credit department approves or disapproves credit. May check references by phone or form letter and notify customer of acceptance or rejection of credit [CREDIT CLERK (clerical)]. May verify entries and correct errors on charge accounts [CUSTOMER-COMPLAINT CLERK (clerical)], using adding machine. May answer credit rating requests from banks and credit bureaus. May issue temporary shopping slip when credit references appear satisfactory. Reasoning (R): 3, Math (M): 2, Language (L): 3

The DOT description for Addresser: No. 209.587-010 is as follows:

> Addresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail. R: 2, M: 1, L: 2

The DOT description for Order Clerk, No. 209.567-014 is as follows:

> Takes food and beverage orders over telephone or intercom system and records order on ticket: Records order and time received on ticket to ensure prompt service, using time-stamping device. Suggests menu items, and substitutions for items not available, and answers questions regarding food or service. Distributes order tickets or calls out order to kitchen employees. May collect charge vouchers and cash for service and keep record of transactions. May be designated according to type of order handled as Telephone-Order Clerk, Drive-In (hotel & rest.); Telephone-Order Clerk, Room Service (hotel & rest.). R: 3, M: 1, L: 2

The DOT defines 03 LEVEL REASONING DEVELOPMENT as follows:

49

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

The DOT defines 03 LANGUAGE DEVELOPMENT as follows:

Reading: Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work. Writing: Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech. Speaking: Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

The DOT defines 02 MATHEMATICAL DEVELOPMENT as follows:

Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

Dictionary of Occupational Titles, Appendix C(III), General Educational Development.

From the evidence, testimony, and the consultative reports, it is clear that Ms. Polynice does not have reasoning and language development skills defined at level three. Nor does she have the mathematical development defined at level two. The Vocational Expert did not explain how a person with Ms. Polynice's limitations could actually obtain and keep a job as an account clerk, addresser, and order clerk on a full-time sustained basis.

Claimant's attorney then asked the vocational expert whether a person with

following functional limitations (in addition to the limitations given by the ALJ)

could perform those jobs:

1) Assume that the person also has to sit with left hand behind their back all
   the time;

2) Assume that the person had to sit with left hand behind back
   occasionally;

3) Assume that the person had severe problems with memory and focus and
   concentration because of pain, anxiety, and depression; and

4) Assume that the person could only sit for one hour at a time before
   changing position for 10 minutes.

The Vocational Expert responded that a person with these additional limitations

could not perform any work. All of these hypotheticals are supported by the

evidence. However, the ALJ erroneously held:

> The Administrative Law Judge notes that these hypothetical situations
> posed by the representative were inconsistent with the established
> residual functional capacity, and were thereby not adopted.

(R: 100).

Wherefore, this Court should reverse and remand for payment of benefits

because Ms. Polynice is unable to work pursuant to the correct hypotheticals

regarding her RFC. In any event, this Court should remand for further explanation

by the vocational expert regarding the requirements of the jobs that he identified.

**VII.   The Magistrate Judge erred in not requiring the Commissioner to submit evidence regarding the approval of Appellant's subsequent claim.**

The Magistrate Judge erred in not inquiring into the reasons that the Commissioner approved Ms. Polynice's subsequent claim. The evidence submitted to the Court and to the Appeals Council indicated that Ms. Polynice continued to receive treatment and surgery for her ongoing orthopedic impairments. Also, obesity continued to exacerbate those conditions.

In <u>Chamblin v. Astrue</u>, 2010 U.S.Dist.LEXIS 108638, * 7 - * 9 (D.Colo. 2010)(many citations omitted), the district court held that evidence of the approval of a subsequent disability claim *may* constitute new and material evidence *justifying* a remand. It comprehensively surveyed the law and summarized the cases supporting this holding, as follows:

> Federal district courts have concluded that "where a second social security application finds a disability commencing at or near the time a decision on a previous application found no such disability, the subsequent finding of a disability may constitute new and material evidence," justifying remand. <u>Hayes v. Astrue</u>, 488 F.Supp.2d 560, 565 (W.D. Va. 2007). . . . Although such a determination is not preclusive, since it may involve "different medical evidence, a different time period, and a different age classification," <u>Hayes</u>, 488 F.Supp.2d at 565 (<u>quoting</u> <u>Bruton v. Massanari</u>, 268 F.3d 824, 827 (9th Cir. 2001). . . , I note that the more recent application was granted based in part on the same consultative examination, performed by Dr. Frederick Leidal in 2007, that was part of the record before the ALJ in this case. . . . It was premised further on the consistency between that opinion and the findings of a subsequent psychiatric consultative examination by Dr. Stuart L. Kutz, Jr. . . . Moreover, there is no

dispute that plaintiff has suffered from schizophrenia since age 19, well prior to her alleged date of onset. . . .

In <u>Owens v. Astrue</u>, 2010 U.S.Dist.LEXIS 101481, * 13 (W.D.Va. 2010), the record indicated that the claimant had suffered from depression and fibromyalgia for many years. There was no evidence that her condition deteriorated between the time the first claim and was denied and the second claim was granted. The court remanded for consideration of the medical record from the subsequent approved claim in the appeal of the antecedent claim. The court held that the "subsequent decision may be highly relevant to the determination of disability in this case."

In an unpublished district court case from the Second Circuit, <u>Tempesta v. Astrue</u>, 2009 U.S.Dist.LEXIS 6019 (E.D.N.Y.2009), the court noted that the record was devoid of *any* medical evidence that the claimant's medical condition improved at the beginning of the subsequent period during which he was disabled. It held that claimant was disabled during the subsequent period and remanded for a redetermination of the antecedent application. <u>See also</u>, <u>Desmond v. Astrue</u>, 660 F.Supp.2d 329, 340 (D.Conn. 2009), <u>adopted</u> 2009 U.S.Dist.LEXIS 84547 (remand so that: "the ALJ can obtain the file [from the subsequent claim], consider the medical evidence from that file to the extent it is relevant to the period at issue, and update the file so that the ALJ may make a thorough determination of disability.")

In the instant case, the SSA determined without a hearing that Ms. Polynice was disabled just six months after the Appeals Council denied her Request for Review in this case. There is no evidence that her mental and physical conditions *significantly* deteriorated from the time of the antecedent period (at issue in this instant Appeal) to the time of the subsequent determination that she was disabled. The evidence in the 2013 claim is very similar to the evidence in this Appeal. The approved new claim was based upon the identical impairments raised in the claim in this Appeal.

It is uncontroverted that Ms. Polynice turned 50 [14] on September 1, 2012. The Magistrate Judge *assumed* that this is the *sole* reason why her subsequent claim was approved. However, there was no evidence on the record to support this bald conclusion. He erred by not directing the Commissioner to submit documentation regarding the approval of the subsequent claim. These documents, not in the possession of Plaintiff, may have well indicated that she was approved based on her inability to perform any work because of her orthopedic and psychiatric conditions.

---

[14] Under Pt. 404, Subpt. P., App. 2, § 200.00(g), age 50-54 is considered to be approaching advanced age for the grids.

## CONCLUSION

The ALJ erred by not fully crediting Ms. Polynice's testimony regarding her limitations. He failed to even consider whether she meets Listing 1.02 and 1.03. He did not consider her physical limitations, her pain, her obesity, and mental illness in combination. The ALJ did not accurately describe her limitations to the Vocational Expert. Furthermore, the Magistrate Judge erred in not obtaining the subsequent claim file so as to ascertain why that claim was approved. As a matter of law, this Court should reverse the Decision of the Commissioner. Based upon the evidence, it should remand for payment of benefits.

Respectfully submitted,

_____

Mark Schneider
Attorney for Donna Polynice
57 Court Street
Plattsburgh, NY  12901
(518) 566-6666

## CERTIFICATION PURSUANT TO FRAP 32(a)(7)(b)(i.)

I, Mark Schneider, certify that this Brief contains 13,556 words and is in compliance with FRAP 32(a)(7)(b)(i.).

_____

Mark Schneider